153 F.Supp.2d 996 (2001)
In re COPPER ANTITRUST LITIGATION.
Ocean View Capital, Inc., f/k/a Triangle Wire & Cable, Inc., Plaintiff,
v.
Sumitomo Corporation of America, Sumitomo Corporation, Sumitomo Futures Corporation, Global Minerals and Metals Corporation, David Campbell, and Credit Lyonnais Rouse, Defendants.
Ocean View Capital, Inc., f/k/a Triangle Wire & Cable, Inc., Plaintiff,
v.
J.P. Morgan & Co., Incorporated and Morgan Guaranty Trust Company of New York, Defendants.
MDL No. 1303, Nos. 99-C-0801-C, 00-C-0528-C.
United States District Court, W.D. Wisconsin.
July 23, 2001.

*997 OPINION AND ORDER
CRABB, District Judge.
Plaintiff Ocean View Capital, Inc. brought these two antitrust actions for damages, alleging in Case No. 99-C-0801-C that it had been injured by conspiratorial actions taken by defendants Sumitomo Corporation of America, Sumitomo Corporation, Sumitomo Futures Corporation, Global Metals and Minerals Corporation, David Campbell and Credit Lyonnais Rouse in violation of the antitrust laws of the United States. It alleged that "[b]eginning in 1990, if not earlier, and continuing through June 13, 1996, defendants conspired to manipulate and corner and did manipulate and corner the market for physical copper and copper futures." Amended Compl., ¶ 22. Plaintiff sued defendants J.P. Morgan & Co., Incorporated and Morgan Guaranty Trust Company of New York in Case No. 00-C-0528-C for participating in the conspiracy and helping to effectuate it by providing capital to the Sumitomo defendants and helping to conceal the existence of the conspiracy. Plaintiff alleged that defendants' actions had caused it harm because it had been forced to pay higher prices for the physical copper it purchased as a direct and predictable consequence of the manipulation of the futures market and the cornering of the physical market for copper. The cases were consolidated with others in this court by order of the Judicial Panel on Multidistrict Litigation. Jurisdiction is present. 28 U.S.C. § 1331, 15 U.S.C. § 15.
The two cases are now before the court on motions for summary judgment filed by all defendants, who contend that plaintiff lacks standing under the antitrust laws to bring this action. Defendants acknowledge that the allegations of plaintiff Ocean View Capital's original complaint were sufficient to survive a motion to dismiss for failure to state a claim, see In re Copper Antitrust Litigation, 98 F.Supp.2d 1039 (2000), but assert that with the completion of discovery on the standing issues, it has become evident that plaintiff lacks antitrust standing. The Morgan defendants advance the same arguments as the other defendants. In addition, they have moved to dismiss the complaint against them on the ground that plaintiff's allegations do not state an antitrust violation against them. I conclude that plaintiff lacks antitrust standing to bring an antitrust action against the moving defendants in both cases for a variety of reasons, including the indirectness of plaintiff's injury and the difficulty of calculating the damages to which it would be entitled. Therefore, I will grant defendants' motions for summary judgment. Plaintiff made a request in its brief for summary judgment in its favor but has shown no reason why its request should be granted. Its unsupported motion for summary judgment will be denied. The disposition of the other motions makes it unnecessary to address the Morgan defendants' motion to dismiss, which is based on its contention that plaintiff has failed to allege an antitrust violation against them.
From the facts proposed by the parties, I find that the following are material and undisputed.

UNDISPUTED FACTS

A. The Parties

Plaintiff Ocean View Capital, Inc., f/k/a Triangle Wire & Cable, Inc., is a corporation organized and existing under the laws of Delaware, with its principal place of business in Rhode Island. Between 1990 and 1996, plaintiff was engaged in the *998 manufacture of copper wire and cable. Defendant Sumitomo Corporation of America is a corporation organized and existing under the laws of New York with its principal place of business in New York. Defendant Sumitomo Corporation is a corporation organized and existing under the laws of Japan with its principal place of business there. Defendant Sumitomo Corporation Futures, Inc. is a corporation organized and existing under the laws of Delaware. Defendant Global Minerals and Metals Corporation is a corporation organized and existing under the laws of Delaware. It is a trader of physical copper and copper futures. Defendant David Campbell was a principal of Global at times relevant to this suit. Defendant Credit Lyonnais Rouse is a foreign corporation authorized to do business in the state of New York.

B. The Copper Market

1. Production of copper

In manufacturing building wire, cable and other copper products, plaintiff used copper rod, which is fabricated from copper cathode. Between 1990 and 1996, the vast majority of copper rod was manufactured in a four-step process. The first step involved extracting copper ore from a mine and placing it in a concentrator to be crushed, milled and treated with a variety of chemicals to extract the minerals and then turned into a powder or gravel-like substance called copper concentrate, which is between 18 to 50% copper. The second step of the process is smelting, which separates the nonferrous metals in the copper concentrate from other minerals, such as sulfur and iron. Smelters also melt and process various forms of copper scrap, such as the copper that remains unused when copper rod is made into copper wire as well as used copper wire itself. Smelters produce "blister" or "anode" from concentrate and scrap. Anode products are one-meter square plates of approximately 98 to 99% copper.
In the third step of the manufacturing process, anode (or blister or copper scrap) is refined electrolytically in a tank of electrolyte containing sulfuric acid and other chemicals. A "starter sheet" of pure copper is placed in a tank where an electrical charge is passed through the electrolyte for several days, causing the copper atoms from the anode to migrate through the acid and accumulate on the starter sheet. The final product is a one-meter square plate, "copper cathode," that is more than 99% copper. In the fourth step, continuous cast copper rod is fabricated from cathode at a rod mill, where cathode or scrap or both are fed into a furnace and melted as they descend through the furnace. At the bottom, spouts direct the molten metal onto a casting wheel that produces a solid bar of copper, which is then processed through a series of dies that gradually reduce the size of the bar to a 5/16" diameter. In terms of chemical composition, the rod is identical to copper cathode; only its appearance has changed.

2. Market participants

Players in the copper market include integrated producers, semi-fabricators, producers, traders, scrap dealers and end users, among others. Integrated producers extract copper ore from mines and process it through the stages of concentrate, blister, anode and cathode. Some have the facilities to fabricate cathode into rod. Despite their ownership of production facilities, producers routinely supplement their own production with scrap, concentrate, blister, anode, cathode and rod bought from unaffiliated producers and traders or from affiliated facilities in which they own partial interests. As a general rule, in buying from affiliated facilities, the *999 producer pays the same price for copper that an unaffiliated entity would pay.
The producers that sold rod to plaintiff owned rod mills. Other rod mills exist that are owned by independent companies known as "semi-fabricators." These semi-fabricators obtain cathode and scrap from producers or trading companies and make it into rod. In addition, they will accept cathode from manufacturers such as plaintiff and convert it into rod for a fabrication fee under an arrangement known as "tolling."
Integrated producers purchase copper from outside sources for a number of reasons. First, the copper is expensive to move. In many instances, it is more economical for the producer to purchase copper from a third party near the delivery point than to transport it. Second, marketing opportunities may arise that a producer cannot exploit if it relies solely on its own production capacity or if it has oversold product in advance or if it is undergoing renovation or expansion of its production facilities. Third, there may be mismatches among a producer's facilities. The mines might not be producing enough ore to keep the smelters operating efficiently or the smelter not making enough blister to fill the refinery's capacity. Fourth, a facility might be temporarily inoperable as a result of flood, earthquake, strike or other unforeseen event.
Trading companies buy and sell copper in the form of concentrate, anode, blister, cathode and scrap but do not own or operate any facilities to process copper. All of the trading companies that sold copper to plaintiff purchased the copper from producers, semi-fabricators and other trading companies.
Semi-fabricators own and operate rod mills or convert cathode into tubing or rod into wire. Like traders, semi-fabricators do not own mines or concentrators and generally do not own smelters or refineries. Semi-fabricators purchase cathode from producers and traders and fabricate the cathode into rod. Some semi-fabricators have the facilities to convert scrap into cathode, which they then fabricate into rod. In addition, semi-fabricators enter into "tolling arrangements" with customers under which they use cathode supplied by the customer to produce rod. In those situations, the semi-fabricator charges the customer only for the cost of conversion and delivery (the rod premium).

3. Copper pricing

On a daily basis, producers, traders, semi-fabricators, scrap dealers and end-users such as plaintiff buy and sell copper in the form of concentrate, blister, anode, cathode, rod and scrap at prices set with reference to the copper prices on the Commodity Exchange, Inc. division of the New York Mercantile Exchange (Comex) or the London Metal Exchange. Between 1990 and 1996, plaintiff purchased copper in the form of rod and cathode. Plaintiff was not trading on the futures exchanges allegedly manipulated by defendants.
Plaintiff "tolled" most of the cathode it purchased with rod mills pursuant to tolling agreements. Also, it purchased cathode that it resold at a profit. In all these sale and re-sale transactions, the purchase price of the cathode was set with reference to Comex.
Most of the copper plaintiff purchased was in the form of rod that it used to manufacture building wire and other products. The price it paid for rod was based on a formula that was a combination of four elements: 1) an exchange-based price formula; 2) a cathode premium; 3) a rod or "shaping" premium; and 4) shipping charges. The exchange-based price formula was set with reference to Comex.
The cathode premium was designed to account for the difference between buying *1000 a single contract on the Comex for an unknown brand of copper at an unknown Comex warehouse location and buying a known brand of copper on a known date with a known quality, as well as more favorable payment terms. The premium was influenced by market forces such as perceptions of supply and demand and the prices competitors were charging. Like the cathode premium, the rod premium was influenced by market forces of supply and demand and reflected factors such as the cost of conversion of cathode into rod.
The shipping charge was the cost of shipping the rod to plaintiff. It could vary with transportation rates and the availability of discounts offered by the supplier. These might be proximity discounts determined by the distance from the supplier, the creditworthiness of the buyer, the supplier's interest in gaining the buyer's business and other offers the buyer might have received. Plaintiff negotiated the cathode and rod premiums and shipping charges with each supplier separately.
In manufacturing building wire and cable, plaintiff produced scrap copper, some of which it sold to scrap dealers for cash at prices set by reference to Comex. Also, plaintiff exchanged scrap copper for copper cathode that it tolled with rod mills or producers. The value of the scrap copper was set by reference to the published scrap prices that were set by reference to Comex.
Although the prices of all forms of physical copper are set by reference to prices on the futures markets, there is no single Comex or London Metal Exchange price quoted and used by all physical market participants at any one time. Comex quotes 24 different prices, one each for delivery in the present month and each month up to two years in the future. Participants in the physical copper market also use Comex intra-day prices to set the prices of the copper they buy and sell. Purchasers of physical copper utilize a variety of exchange based formulas to set the price of the copper at the same time in light of their own particular pricing strategies, which are driven by their own views of supply and demand. For example, between 1990 and 1996, cathode and rod were bought and sold utilizing such formulas among others as 1) the Comex month average price for the month of delivery; 2) the Comex price at a particular time during the month of delivery; 3) forward fixed pricing; and 4) the previous day's Comex closing price. At various times between 1990 and 1996, plaintiff used each of these formulas to set the price of the rod it purchased. To various degrees, the pricing formula employed will protect the purchaser from the effects of a manipulation of the underlying index that is used as reference point.
The premiums and discounts that are components of the price of various forms of physical copper are heavily influenced by market forces of supply and demand and will vary over time and from supplier to supplier. The effect of changes in Comex or the London Metal Exchange prices on the prices that purchasers pay for physical copper will therefore vary over time (and between suppliers) because those prices are affected directly by supply and demand factors as well as published exchange prices.
The numerous exchange-based pricing formulas used in the purchase of physical copper and the existence of market-driven premiums and discounts that vary over time and among suppliers mean that the effects of a futures market manipulation would be neither direct nor predictable. For example, the prices paid for physical copper delivered in July 1995 could have varied by as much as 90%, depending on which pricing formulas were used. According to fundamental principles of economic *1001 theory, physical prices tend to diverge from futures market prices, rather than exhibit a direct and predictable cause and effect relationship.
The primary product that plaintiff bought between 1990 and 1996 was continuous cast copper rod. During that time period, continuous cast copper rod was not traded on the London Metal Exchange or Comex or stored in exchange warehouses.

C. Plaintiff's Suppliers

1. Magma Metals Corporation

Between 1990 and 1996, plaintiff purchased rod from Magma Metals Corporation. In 1996, Magma was acquired by BHP Copper, Inc. Plaintiff continued to make purchases from BHP. (I will refer to both corporations as Magma.) Magma owned and operated mines in the United States, as well as a smelter, refinery and rod mill. It purchased copper in various forms from third parties in order to make cathode and rod and sell them to its customers such as plaintiff. Between 1990 and 1996, Magma purchased concentrate both from traders and from numerous third parties, including Asarco, Cyprus Minerals, Cananea Mines, Grupo Mexico, Kennecott and BHP. Magma acquired concentrate from 23 different mines, five of which it owned in full, two of which it owned in part and 16 in which it had no ownership interest. Magma made these third-party purchases because its own smelter's capacity was substantially larger than the production capacity of its mines and because it was not economically feasible to operate the smelter at less than full capacity. Magma's purchases from non-affiliated smelters (those in which it had no ownership interest) and traders accounted for between 37 and 40% of the concentrate it used in its refining operations. The price it paid for concentrate was set with reference to either Comex or the London Metal Exchange, less refining and treatment charges that were negotiated by the parties.
Magma sold copper concentrate to producers and dealers, including Metals & Commodity, Glencore, Cyprus, Kennecott, Phelps Dodge, Metals Concentrates International, Inc. and Asarco.
Between 1990 and 1996, Magma purchased blister from third parties, such as Cox Creek Refining Corporation and Kennecott and used it to make cathode. It purchased anode from third parties such as Kennecott and sold it to third parties such as Cyprus, Kennecott, Phelps Dodge, Southwire and Noranda. It used the anode it purchased to make copper cathode. In addition, Magma purchased copper scrap from traders and processed it into cathode. Although it produced cathode, it also purchased a substantial amount of cathode from third parties in order to fulfill its obligations to its cathode customers. It also fabricated some of this cathode, including Magma brand cathode it repurchased from third parties, into rod that it sold to its rod customers such as plaintiff. The prices Magma paid for the anode, blister, cathode and scrap were set with reference to either Comex or the London Metal Exchange. The price at which it sold anode was set with reference to either Comex or the London Metal Exchange.

2. ASARCO Incorporated

Between 1990 and 1996, plaintiff purchased copper from ASARCO Incorporated, primarily in the form of rod but also as cathode. Asarco owned and operated copper mines, smelters, refineries and rod mills in the United States. Although it was a copper producer, it purchased copper in various forms from third parties in order to make the cathode and rod that it sold to plaintiff and others. Asarco purchased concentrate from producers and traders because the capacity of its smelters *1002 was larger than that of its mines. Although Asarco wholly owned three mines in Arizona and had partial interests in 13 other mines in North and South America, it obtained concentrates from 50 mines around the world, as well as from traders. Asarco obtained blister and anode from 12 different smelters. Two of these were wholly owned by Asarco, three were partially owned and the remainder were not affiliated with Asarco. Asarco made the purchases because the capacity of its refinery exceeded the capacity of its smelters. Asarco also purchased small amounts of scrap for use in making cathode. Between 1990 and 1996, Asarco's purchases of concentrate, anode, blister and scrap from non-affiliated sources accounted for at least 41% of the copper that Asarco used to make its own brand of cathode at its Amarillo refinery. The prices Asarco paid for the concentrate, anode and scrap it purchased were set by reference to Comex.
Between 1990 and 1996, Asarco purchased cathode from third parties. In some instances, it repurchased its own brand of cathode. It tended to oversell its maximum production capacity by two to three percent each month in the expectation that a number of its purchasers would buy less than they had contracted for and it preferred to use its own brand of cathode for delivery to Amarillo for rod fabrication. Between January 1993 and June 1996, Asarco purchased at least 153,000,000 pounds of cathode for delivery to its Amarillo facility. As a general rule, the price Asarco paid for the cathode it purchased from third parties was set according to a base price of the Comex month average as well as a premium.

3. Phelps Dodge Corporation

Between 1990 and 1996, plaintiff purchased rod from Phelps Dodge Corporation. Plaintiff contracted with Phelps Dodge to toll cathode that plaintiff had obtained from third parties in exchange for scrap. Phelps Dodge owned and operated mines and smelters in the United States, as well as an electrolytic refinery and rod mill in El Paso, Texas, and a rod mill in Norwich, Connecticut. Approximately 67% of the rod that plaintiff purchased from Phelps Dodge came from the Norwich rod mill; the remainder came from the El Paso rod mill.
Although Phelps Dodge is an integrated producer, it also made purchases from third parties of substantial amounts of copper that it used to make the cathode and rod it sold to customers such as plaintiff. Between 1990 and 1996, Phelps Dodge bought concentrate from a number of third parties, including Asarco, Cyprus and traders, for use in its smelters (both wholly owned and partially owned). Phelps Dodge acquired concentrate from 25 mines, three of which it wholly owned, six of which it partially owned and 16 in which it had no ownership interest. The concentrate Phelps Dodge purchased from third parties was incorporated into its manufacturing process and used to make cathode and rod at its El Paso refinery and rod mill. Like other integrated producers, Phelps Dodge purchased concentrate from third parties because its mines did not produce sufficient quantities of concentrate to enable it to operate the mines at optimal capacity. From time to time it purchased scrap for processing in its smelters. Phelps Dodge also bought and sold anode that it processed at the El Paso refinery for cathode. The anode and blister it purchased from third party producers for its El Paso refinery originated from 13 smelters, one of which Phelps Dodge wholly owned, three of which it partially owned and nine in which it had no ownership interest.
Twelve percent of the copper Phelps Dodge used in its El Paso refinery to *1003 create cathode came from sources in which Phelps Dodge had no ownership interest. Only 16% of the copper it processed came from wholly owned facilities. Between 1992 and 1996, Phelps Dodge purchased more than 192,000,000 pounds of blister and 37,000,000 pounds of scrap for its El Paso operations. Between 1990 and 1996, Phelps Dodge purchased more than 750,000,000 million pounds of cathode from other producers and traders for use in its Norwich rod mill. It was more cost-effective to purchase third party cathode for the Norwich facility than to ship cathode from Texas to Connecticut. During this same period, Phelps Dodge purchased more than 65,000,000 pounds of cathode for use at its El Paso rod mill. The prices Phelps Dodge paid for cathode, concentrate, blister, anode and scrap were set with reference to Comex or the London Metal Exchange.

4. Cyprus Copper Marketing Corporation

In 1995, plaintiff purchased 616,651 pounds of copper from Cyprus Copper Marketing Corporation. This was less than one-quarter of one percent of the copper plaintiff purchased between 1994 and 1996. Cyprus purchased a small amount of concentrate from third parties for use in its refining operations. Beginning in 1995 or 1996, it also purchased cathode from third parties.

5. Minemet, Inc. and Pechiney World Trade USA, Inc.

Between 1990 and 1996, plaintiff purchased cathode and rod from Minemet, Inc. and Pechiney World Trade USA, Inc. (Pechiney acquired the assets of Minemet in 1994.) Pechiney and Minemet were trading companies that did not own mines, concentrators, smelters or refineries. All of the copper they sold to plaintiff had been purchased from third parties. Some or all of the rod that plaintiff purchased from Minemet and Pechiney had been fabricated by Westinghouse. Minemet and Pechiney paid Westinghouse for the cathode that was in the rod sold to plaintiff, plus a fee for fabricating the rod. Westinghouse purchased the cathode from third parties. Between 1990 and 1996, Pechiney and Minemet bought and sold various forms of physical copper, including copper ore, concentrate, blister, cathode, rod and scrap from and to producers, traders and semi-fabricators, including other companies that sold copper to plaintiff such as Asarco, Magma, Gerald Metals, Southwire, Westinghouse and AmRod.

6. Gerald Metals, Inc.

Between 1990 and 1996, plaintiff engaged in copper-related transactions with Gerald Metals, Inc. Gerald was an international trader of copper that bought and sold copper concentrate, anodes, blister, cathode and scrap from a number of companies, including Asarco, Magma, Kennecott, Essex Group, Phelps Dodge and Pechiney. The prices of the purchases and sales were set with reference to either the Comex or the London Metal Exchange. Gerald did not own any mines, concentrators, smelters or refineries. Any copper it sold to plaintiff had been purchased previously from third parties.
From 1990 until the middle of 1993, plaintiff sold scrap to Gerald. Generally, plaintiff received cash in exchange for the scrap; on occasion, Gerald supplied plaintiff with cathode or rod. After mid-1993, plaintiff usually received cathode from Gerald in exchange for scrap and arranged with Gerald for the cathode to be sent to a rod mill where it was fabricated into copper rod.

7. Traders

Between 1990 and 1993, plaintiff purchased copper from Barclays Metals, Deek *1004 International, Elders Raw Materials, Mitsubishi Materials (America) and Prudential Bache. All of these companies were trading companies that bought copper from third parties and resold that copper to third parties. All of the copper that these trading companies sold to plaintiff would have been purchased by them from third parties. Plaintiff's purchases from Mitsubishi and some of its purchases from Barclays consisted of purchases of cathode that plaintiff resold at a profit to traders.

8. Semi-fabricators

Between 1990 and 1996, plaintiff purchased rod from AmRod Corporation, a semi-fabricator. Plaintiff used AmRod to toll cathode that plaintiff obtained from third parties. AmRod owned a rod mill in which it fabricated cathode into rod. It did not own any mines, concentrators, smelters or refineries. All the cathode AmRod used to make rod was purchased from third parties, including Noranda, Asarco, Codelco, Kennecott, Gerald Metals and Minemet, at prices set with reference to Comex.
Between 1990 and 1996, plaintiff purchased rod from Southwire Company, a semi-fabricator. (Plaintiff had some tolling arrangements with the company as well.) Southwire owned and operated a rod mill and wire mill, as well as facilities to convert copper scrap that it obtained from scrap traders into cathode that was then fabricated into rod. It did not own or operate any mines or concentrators. It purchased cathode from producers and traders, including Asarco, Gerald, Pechiney and Minemet. Occasionally, it bought cathode from sources in Chile and Peru. Most of the cathode it purchased or made from scrap was converted into rod. Also, Southwire sold cathode to third parties, including manufacturers and traders. The prices at which it purchased and sold cathode were set by reference to either Comex or the London Metal Exchange. All of the copper rod Southwire fabricated was made from copper it had obtained from third parties. Southwire tolled scrap copper obtained from plaintiff into rod. Approximately 15% of the rod plaintiff received from Southwire came from scrap supplied by plaintiff.

D. Copper Sources

Copper is fungible and loses its identity as it is processed, refined and fabricated into rod, making it impossible to determine the source of the copper in any particular pound of cathode or rod. Magma, Phelps Dodge, Asarco, Pechiney, AmRod and Westinghouse are unable to trace the sources of particular copper sold to plaintiff or fabricated into a particular pound of cathode or rod.

E. Hedging

Participants in the physical copper market who contract to buy and sell copper are exposed to the risk that price fluctuations will reduce the value of their copper. Purchasers are exposed to the risk that copper prices will decline before they sell their copper. Parties who agree to sell copper at a given price at a future date are exposed to the risk that copper prices will increase above the contracted price. To protect against the risk of price fluctuations, producers, traders and semi-fabricators routinely use the futures markets (Comex or the London Metal Exchange) to hedge their physical obligations and shift their price risk to their counterparts in the market. All but one of plaintiff's suppliers hedged all or part of their physical obligations.
Gerald, Pechiney and Minemet managed their price risk by hedging on Comex or the London Metal Exchange. AmRod managed its price risk by hedging on Comex. Southwire managed its price risk for some of its transactions, including all forward priced sales, by hedging on Comex. Magma managed its forward priced sales *1005 by hedging on Comex or the London Metal Exchange. Asarco used a variety of hedging strategies: it hedged its future physical production to establish a floor price for that production; it hedged its monthly physical obligations to balance its books (selling copper futures contracts, for example, in months in which it had sold less copper than it had purchased); and it hedged sales transactions with customers when those customers forward priced or placed an order for a future date at a fixed price. In these instances, Asarco offset the sale with a futures contract on Comex.
Phelps Dodge regularly hedged its physical copper obligations by buying and selling futures contracts on Comex in order to lay off its price risk onto the market. In situations in which a Phelps Dodge customer forward priced one month into the future, Phelps Dodge would sometimes hedge the sale through a back-to-back physical transaction, by simultaneously entering into an agreement to purchase that same quantity of rod at the same fixed price so as to avoid any price risk.
The purpose of all the hedging strategies is to protect the hedger from price fluctuations by transferring that risk to participants in the futures market.
Plaintiff used copper rod to manufacture building wire and other copper products. Because the price of copper accounted for roughly 80% of plaintiff's manufacturing costs, the price and availability of copper would have had a significant effect on plaintiff's production costs and sales prices. The cost of building wire closely follows the copper market. Comex was the overriding factor that affected the market price of plaintiff's copper-end products on a day-to-day basis.

F. Direct Purchases from Defendants

Between 1990 and 1996, plaintiff never purchased any copper from any of the defendants, with the exception of a series of transactions with defendant Sumitomo Corporation of America in 1992. These transactions took the form of simultaneous purchases and sales and were made to enable Sumitomo to obtain copper in more favorable locations. They involved fewer than 11,000,000 pounds of copper and less than $12,000,000. The documents reflecting the transactions do not show which party received more money as a net result of the transactions.

G. Other Litigation

In 1996, two lawsuits were filed in California state court arising out of the alleged manipulation of the price of copper between January 1, 1993 and July 1, 1996, by defendants Sumitomo Corporation of America, Global Metals and Minerals and Campbell. The suits were filed as class actions on behalf of all persons who had purchased copper products, defined to include concentrate, blister, anode and cathode, between January 1, 1993 and July 1, 1996, and who at the time of the purchases resided in a group of defined states, purchased copper products from persons residing in one of those states or purchased any copper for delivery in one of those states. The actions were settled. In connection with the settlement, BHP/Magma, Asarco and Gerald filed proofs of claim that were allowed in the following amounts: 1) BHP/Magma, $1,167,298,575.00; 2) Asarco, $543,128,847.00; and 3) Gerald, $95,790,545.61. BHP/Magma received a payment from the settlement fund of $1,768,148.22; Asarco received $822,696.37; and Gerald received $145,097.31.
In 1996, a lawsuit was filed by futures traders in the United States District Court for the Southern District of New York arising out of the alleged manipulation of the price of copper futures and options contracts between June 20, 1990 and June 19, 1996, by defendants Sumitomo Corporation *1006 of America, Global Metals and Minerals and David Campbell.

OPINION
Section 4 of the Clayton Act, 15 U.S.C. § 15, provides a federal cause of action to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." Plaintiff contends that it fits within the provisions of this statute: it has suffered injury to its business of manufacturing building wire (by having to pay higher prices for the copper cathode and copper rod it purchased) as a result of defendants' violation of section 1 of the Sherman Act, 15 U.S.C. § 1, which forbids conspiracy in restraint of trade. A review of the text of § 15 would suggest that plaintiff is correct. In reality, however, the language of the Clayton Act is not as broad as it seems. For practical reasons, it has been narrowed by the Supreme Court in an effort to effectuate the congressional intent that the act be construed in light of its common law background. See Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 531, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (quoting Senator Sherman's statement that proposed law "does not announce a new principle of law, but applies old and well recognized principles of the common-law to the complicated jurisdiction of our State and Federal Government") (21 Cong.Rec. 2456). See also National Society of Professional Engineers v. United States, 435 U.S. 679, 687-88, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978): "Congress, however, did not intend the text of the Sherman Act to delineate the full meaning of the statute or its application in concrete situations. The legislative history makes it perfectly clear that [Congress] expected the courts to give shape to the statute's broad mandate by drawing on common-law tradition." See also Blue Shield of Virginia v. McCready, 457 U.S. 465, 477, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) ("It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property").
After 111 years of interpretation, certain principles have evolved to define antitrust standing, which is distinct from Article III standing. In both instances, the plaintiff must plead an injury in fact but in antitrust cases, "the court must make the further determination whether the plaintiff is a proper party to bring a private antitrust action." Associated General Contractors, 459 U.S. at 535 n. 31, 103 S.Ct. 897. Plaintiffs must show not only that they have suffered the type of injury that the antitrust laws were intended to prevent and that their injuries are a result of defendant's unlawful conduct, see, e.g., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), but that they are in the best position to vindicate the alleged violation because their injuries are neither indirect nor secondary in nature. See Associated General Contractors, 459 U.S. at 537-45, 103 S.Ct. 897. In determining which plaintiffs are best placed to sue, courts consider the causal connection between the alleged antitrust violation and the harm to the plaintiff and the defendant's intent to cause the harm; whether the injury was of a type the laws were designed to prevent; the directness or indirectness of the alleged injury; the existence of more direct victims who can assert a claim against the wrongdoer; the nature of the plaintiff's injuries (whether they are speculative or determinable); and the risk of duplicative recoveries or complex apportionment of damages. See id.
Application of these factors to plaintiff's situation leads ineluctably to the *1007 conclusion that plaintiff is not in a position to sue these defendants for antitrust violations. The question is not a close one, although plaintiff makes a modest effort to characterize it as one. As the undisputed facts show, it is only in the most generalized fashion that the manipulation of the futures market can be said to affect the cash markets. That there is some effect is undisputed. What that effect might be in any particular transaction is another matter altogether. The number of exchange-based pricing formulas, the laws of supply and demand and the premiums and discounts that reflect supply and demand make it exceedingly difficult, if not impossible, to trace the influence of the futures prices. The physical copper market and the copper futures markets do not move in lockstep. As a consequence, there is only an attenuated causal connection between the harm to plaintiff and defendants' violation; the alleged injury is not a direct one.
Moreover, plaintiff's theory of recovery rests on extraordinarily complex damage computations and a high risk of duplicative recovery, in violation of the principles espoused by the Supreme Court in Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), and Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). In Illinois Brick, the defendants were manufacturers of concrete block that had engaged in price fixing. Plaintiffs were governmental entities that had purchased buildings built by general contractors, who in turn had bought the block from the manufacturers; plaintiffs were not the direct purchasers of the overly expensive concrete blocks, as they might have been under a different building arrangement. The question for the Court was whether indirect purchasers such as plaintiffs should be able to sue in such a situation. Earlier, in Hanover Shoe, the Court had held that a manufacturer charged with violating the antitrust laws could not use as a defense the fact that the plaintiff customer had passed on illegal overcharges to its own customers. As the Court noted in Illinois Brick, in rejecting the passing on defense in Hanover Shoe, it had been unwilling "to complicate treble-damages actions with attempts to trace the effects of the overcharge on the purchaser's prices, sales, costs, and profits, and of showing that these variables would have behaved differently without the overcharge." Illinois Brick, 431 U.S. at 725, 97 S.Ct. 2061. In addition, the Court had been concerned that "unless direct purchasers were allowed to sue for the portion of the overcharge arguably passed on to indirect purchasers, antitrust violators `would retain the fruits of their illegality' because indirect purchasers `would have only a tiny stake in the lawsuit' and hence little incentive to sue." Id. at 725-26, 97 S.Ct. 2061 (quoting Hanover Shoe, 392 U.S. at 494, 88 S.Ct. 2224).
Illinois Brick forced the Court to decide two questions: whether it should apply the rule announced in Hanover Shoe equally to plaintiffs and defendants and whether it had reached the right conclusion in that case when it held that it was only the overcharged direct purchaser that was the party "injured in his business and property" within the meaning of § 4 of the Clayton Act, rather than others in the chain of manufacture and distribution. It answered yes to both questions. The rule announced in Hanover Shoe operated to bar plaintiffs from using the passing on theory offensively, that is, by arguing that they had been injured by the general contractors' passing on to them of the overcharge on the concrete blocks, and the rule enhanced the effectiveness of the antitrust treble-damages action by precluding indirect purchasers down the distribution chain from suing to recover the fraction of the overcharge allegedly passed on to *1008 them. See Illinois Brick, 431 U.S. at 728-29, 97 S.Ct. 2061.
Two policy concerns animated the Court's decision in Illinois Brick: the transformation of "treble-damages actions into massive multiparty litigations involving many levels of distribution and including large classes of ultimate consumers remote from the defendant," see id. at 745, 97 S.Ct. 2061 and the enormity of the task that courts would face in attempting to determine damages incurred at each level of distribution. See Phillip E. Areeda & Herbert Hovenkamp, II Antitrust Law ¶ 346c (Rev. ed. 1995) ("The point to be drawn from Illinois Brick and its predecessor, Hanover Shoe, is the practical one that the effectiveness of the antitrust remedy would be undercut if the task of tracing antitrust injuries and determining damages becomes overly complex.").
Even when the damages calculation is not complex, the Court has refused to waver from its position that the purchaser that buys directly from the alleged antitrust violator is the only party that can assert antitrust standing. In Kansas v. UtiliCorp United, Inc., 497 U.S. 199, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990), for example, the Court refused to recognize antitrust standing for customers of utility companies, despite the fact the utility companies had passed on to those customers 100% of the alleged overcharges for gas. The Court acknowledged that the economic assumptions underlying Illinois Brick might not apply with equal force in all cases and might even be disproved in a particular case, but confirmed its belief that "ample justification exists for our stated decision not to `carve out exceptions to the [direct purchaser] rule for particular types of markets.' Illinois Brick, 431 U.S. at 744, 97 S.Ct. 2061. The possibility of allowing an exception, even in meritorious circumstances, would undermine the rule." UtiliCorp United, 497 U.S. at 216-17, 110 S.Ct. 2807.
Plaintiff Ocean View has not alleged that it bought more than a relatively tiny percentage of copper cathode or copper rod from one of the defendants. It has adopted a different approach, which is to argue that the wrongdoing of the defendants had as its object the manipulation of prices on the futures market that served as the index for prices on the physical market. Because copper cathode is the only form of copper that is the subject of futures contracts and because defendants concentrated their efforts to manipulate the physical market for copper by stockpiling huge supplies of copper cathode and not raw copper or concentrate, plaintiff argues that the relevant "market" for antitrust purposes is the copper cathode market. This market definition is purposeful. By limiting the antitrust focus to the copper cathode market, plaintiff can call itself the "first purchaser" in the market. As the first purchaser, it contends, it was directly injured by the manipulation of prices for copper cathode and thus has standing to sue any supplier that made its own cathode. It avoids the Illinois Brick concern of duplicative recoveries because it is the first entity to pay an overcharge tied to copper cathode prices, as contrasted with purchasers of pre-cathode copper. Each time that plaintiff bought cathode or rod in the relevant market during the period of defendants' manipulation, it had to pay a higher price for copper cathode or rod than it would have paid had it not been for defendants' manipulation of the futures markets in copper cathode.
Plaintiff agrees that it cannot be deemed the first purchaser when it bought cathode from suppliers that had not made the cathode themselves. In that circumstance, it concedes, its purchase of the cathode would not be the first time the cathode had *1009 been sold; therefore, plaintiff would not be entitled to damages as the first purchaser.
Plaintiff maintains that the first purchaser of a product at a manipulated price is the equivalent of a direct purchaser because it is the first to feel the effects of the conspirators' efforts to manipulate the prices of the product. Such a purchaser is best positioned to assert antitrust claims resulting from the conspirators' actions. Moreover, plaintiff argues, it makes no difference to the assertion of standing that it would be difficult to prove exactly how much of the cathode plaintiff purchased had not been the subject of a previous purchase by the supplier because the quantities can be estimated. Plaintiff does not say exactly how the estimate would be made. Presumably, plaintiff would determine for any given year (or other time period) how much cathode Supplier A made and how much Supplier A bought from other suppliers and then apply the percentage of purchased cathode to the percentage of cathode Supplier A sold to plaintiff in that year. This would produce an estimate of the amount of cathode plaintiff bought from Supplier A in a given year that had never been purchased before. Plaintiff admits that it has no evidence at the present time that would enable it to make these estimates but denies that this is any problem. Its discovery to date has been limited to standing only; when the discovery limits are lifted, it says, it will subpoena the evidence it needs from its suppliers.
The flaws in plaintiff's theory are manifold. First, there is no support in the case law for plaintiff's theory of the first purchaser as the equivalent of the direct purchaser under Illinois Brick. In all probability, plaintiff is trying to adapt its claim to the concept of "umbrella standing" relied upon in Sanner v. Board of Trade, 62 F.3d 918 (7th Cir.1995). In Sanner, individual soybean farmers sued the Chicago Board of Trade, alleging that the board had violated the antitrust laws by passing a regulation requiring holders of long term positions in soybean futures to liquidate them according to a specified schedule, as a means of bringing down the cash price of soybeans. The farmers alleged that they had suffered injury when they tried to sell their soybean crops because of the board's action, which had depressed the price of soybeans. The court of appeals held that the district court had acted prematurely in dismissing the farmers' claim. The district court had held that the cash and futures markets were distinct markets; the farmers had not participated in the futures markets; the causal link between the cash value of soybeans and the manipulation of the futures market was too attenuated; the nature of the damages was too speculative; and other persons might in a better position to sue. The court of appeals disagreed with these holdings, finding the farmers' allegations sufficient to withstand a motion to dismiss. As to the alleged distinctions between the cash and futures markets, the farmers had alleged both that the board had acted with the intent of prompting a downturn in the cash market for soybeans and that the two markets moved in lockstep because they involved the same commodities to be delivered immediately or sometime in the future. As to damages, the court of appeals was satisfied that the damages calculation would not be particularly difficult: "Both parties can offer proof concerning the extent to which a decline in the cash market price of soybeans (an objectively verifiable matter) was or was not attributable to the liquidation of positions prompted by the [board of trade's] Resolution." Id. at 930.
Sanner does not provide support for plaintiff's assertion of standing, now that the record has been developed and the case is before the court on motions for summary judgment. Sanner was decided *1010 on a motion to dismiss. At that stage, it was proper to accept the plaintiff farmers' allegation that the cash and futures soybean markets moved in lockstep. (For the same reason, it was proper to accept plaintiff's allegation in this case that "a manipulation of the price of copper futures on the COMEX and/or the LME would directly and predictably correlate with a manipulation of copper prices on the cash market," Plt.'s Am.Compl., dkt. # 155, ¶ 21, when deciding defendants' motion to dismiss the complaint. See In re Copper Antitrust Litigation, 98 F.Supp.2d at 1050.) It was evident, however, that the plaintiffs in Sanner would be unable to succeed on their claim if they could not prove their allegations about the way in which the markets worked. In this case, the undisputed facts show that the relationship between the futures market and the physical market is not direct and predictable; many factors other than the futures prices enter into the price calculations for physical copper. Cf. In re Beef Industry Antitrust Litigation, 710 F.2d 216 (5th Cir.1983) (on motion to dismiss, allegations of "rigid formula pricing" tied to daily reports of beef prices sufficient to proceed; on motion for summary judgment, defendants' "overwhelming proof," id. at 219, that factors other than daily price reports influenced beef pricing and plaintiffs' failure to raise genuine issue in response supported grant of summary judgment for defendants); In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation, 691 F.2d 1335 (9th Cir.1982) (risk of double recovery and unacceptable level of speculation and complexity of damages calculation doomed retail gasoline purchasers' assertion of umbrella standing when purchasers bought from non-defendants).
It is telling that plaintiff ignores the obvious problem of characterizing the market as a cathode market, when the undisputed facts show that rod is made from cathode. Therefore, any time plaintiff bought rod rather than tolling it, it was buying previously purchased cathode that had been turned into rod. Because most of its purchases were of rod, plaintiff's "cathode market" theory is not even relevant to its situation.
Even if, as plaintiff argues, it is entitled to sue because it was injured directly by defendants' antitrust violations on each occasion that it bought copper cathode or rod at a price tied to the metals exchanges, it must show that allowing it to do so would not result in duplicative recovery or an overly complex determination of damages. It cannot make such a showing. Plaintiff has the initial challenge of showing that it was the first purchaser of copper cathode. As it has conceded, in many instances it could not make this showing. It bought regularly from suppliers such as traders and semi-fabricators that had to purchase copper cathode for sale to plaintiff because they had no facilities for making their own.
Even when plaintiff bought from producers, it could not be sure that the producers were selling their own product or purchased product. Plaintiff has no documentation to prove the source of any copper cathode it purchased or any evidence from which it might estimate what percentage of the cathode it purchased had been purchased previously. It is no answer for it to say that such evidence can be obtained in the future or that it need not be produced at this time because it relates only to damages. The missing evidence is critical to plaintiff's assertion of standing, since among the elements of antitrust standing it would have to prove at trial are that a damage calculation would not be impossibly complex and that it would be possible to determine plaintiff's damages without duplicating the damages of any other potential plaintiff. On a motion for summary judgment, the party opposing the motion *1011 must reveal its hand. It must adduce evidence sufficient to create a genuine issue as to each material fact; it cannot resist the motion simply by suggesting it will have controverting evidence at trial. See, e.g., Schacht v. Wisconsin Dept. of Corrections, 175 F.3d 497, 504 (7th Cir. 1999).
Of course, this missing evidence is only one of many problems plaintiff has. Even with the evidence that would allow it to estimate what percentage of copper cathode it bought "first," estimations would not solve the more intractable problem of determining the overcharge that plaintiff paid in any given transaction. As I understand plaintiff's theory of computing damages, plaintiff would begin with an estimate of the percentage of copper cathode and rod it bought in a given time period and then attempt to disentangle the factors that went into the purchase price of that copper to determine the portion that was the result of illegal manipulation. If this is the damage calculation process, it leaves unanswered a myriad of questions. What price would plaintiff use as its starting point? Would it take an average price paid for all the copper over the time period (since it could not know as to any given day or any particular transaction whether the cathode it was buying had been purchased previously)? If so, how could it trace an average price to any indexed price, when the indexed prices on the Comex alone change from day to day and include 24 variations each day? The difficulty, if not the absurdity, of trying to calculate damages is obvious.
Not only is the damage calculation the kind that Illinois Brick and Hanover Shoe have ruled inimical to the policies underlying the antitrust laws, any damages awarded to plaintiff would inevitably be duplicative of damages due others. There is no way to determine which cathode should be considered a "first purchase." Because there is not, there is no way to determine whether another player in the copper market might be entitled to damages for having paid a higher price on the same copper. There is no simple or straightforward way to analyze a particular purchase price and determine whether it represents an overcharge attributable to defendants' manipulation or the seller's passing on of the original overcharge, with perhaps a second overcharge resulting from indexing the second sale to the futures market. As in In re Copper Antitrust Litigation (Loeb Industries v. Sumitomo Corp.), 196 F.R.D. 348, 357 (W.D.Wis.2000), "the complexities of the copper transactions in which plaintiffs engaged made it ... difficult to determine whether they ... were injured directly by defendants' antitrust violations and not just by the passing on of prior overcharges tied to the futures market."
Sanner, 62 F.3d 918, provides no help to plaintiff in this regard. In Sanner, the plaintiffs were in fact the first line of persons injured: presumably they had grown the soybeans that were the subject of the price manipulation. There was no evidence that they were selling soybeans they had purchased from others or that they were re-selling beans to other farmers (at indexed prices) who were also seeking damages for the price manipulation.
The availability of hedging and its wide use are other reasons to find that plaintiff was not the first to incur injury because of manipulation of the futures prices for cathode. (It is worth noting that in Sanner, the court never discussed the possibility of hedging and its effect on plaintiffs' assertion of umbrella standing, although it is a common practice in all commodities markets.) The routine use of hedging by suppliers of cathode and other copper products means that most of the copper that was sold to plaintiff had been the subject *1012 of a hedge. Assuming that plaintiff's allegations are correct and that defendants were manipulating the futures markets throughout this period, the market price at which a supplier hedged its future sales of copper would have been an artificial one that caused the supplier injury long before it shipped copper to plaintiff. To the extent that the supplier passed on the artificial price, plaintiff's damages would be duplicative of its supplier's, who could assert its own claim for overcharges on the same copper. In fact, several of plaintiff's suppliers have done just that in the lawsuits filed in California against defendants Sumitomo Corporation of America, Campbell and Global and have recovered money on their claims. Plaintiff argues that the California lawsuits are separate matters, based on different claims and brought under a wholly different law that allows recovery up and down the distribution chain. Whether or not plaintiff is correct about the lack of overlap between this suit and the California ones, the fact remains that allowing plaintiff to sue for damages that might have been incurred by others higher up the distribution chain violates the Illinois Brick and Hanover Shoe rule denying standing in situations in which there is a serious risk of multiple liability. More important, the assertion underscores the difficulty of unraveling the tangled skein of copper transactions to determine the source of the copper and how the purchase price was derived.
At the outset of its brief, plaintiff expressed concern that if it were not granted standing, no potential plaintiffs could sue unless they "could prove to a mathematical certainty that whatever copper cathode they purchased contained only copper that their vendor itself mined," Plt.'s Mem. in Response, dkt. # 384, at 1, and that if defendants' view is adopted by the court, defendants would have found "the perfect, victimless, crime, or at the very least, a crime whose victims are without remedy." Id. at 4. It is true that courts are to take into consideration the existence or nonexistence of more direct victims who can assert a claim against a wrongdoer, see Associated General Contractors, 459 U.S. at 540-41, 103 S.Ct. 897, but that is only one of the factors to be weighed in the balance. In itself, it is not sufficient to provide standing if the other factors do not point toward the same conclusion. In any event, other plaintiffs do exist. They include not only the entities who are part of the class action in federal court in New York, but presumably those who bought copper directly from defendants at a supracompetative price.
Plaintiff is not suing to recover on that basis, even though it did buy copper directly from defendant Sumitomo Corporation of America at one period in 1992. It has never based any demand for relief on direct sales from Sumitomo.
I conclude that plaintiff has not adduced evidence sufficient to create a genuine issue that it has antitrust standing to sue defendants. Therefore, I will grant defendants' motions for summary judgment and deny plaintiff's. With this determination, it is unnecessary to address the Morgan defendants' motion to dismiss plaintiff's complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6) on the ground that plaintiff failed to allege that these defendants participated directly in any transaction in violation of the antitrust laws.
Plaintiff's state law claim under Rhode Island law fails for the same reasons as the federal law claim because the Rhode Island Antitrust Act is "construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable, except where provisions of this chapter are expressly contrary to applicable federal provisions as construed." R.I.Gen.Laws § 6-36-2(b). Nothing in the Rhode Island antitrust laws is contrary to *1013 the Supreme Court's interpretation of the Sherman Act in Illinois Brick, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).
Plaintiff has asked that its state law claim be dismissed without prejudice but it has offered no argument to support its request or cited any provision of Rhode Island case law or statutes that would suggest that the state's laws are construed differently from federal laws with respect to antitrust standing. There is no reason to allow this matter to proceed in state court when there is no apparent basis on which it could succeed.
Before ending this opinion, I want to comment on the excellence of the briefing and the presentation of the proposed findings of fact. It is not often that courts have the pleasure of working with such well prepared materials. Counsel are to be commended for their work.

ORDER
IT IS ORDERED that the motion for summary judgment of plaintiff Ocean View Capital, Inc., f/k/a Triangle Wire & Cable, Inc. is DENIED; the motions for summary judgment filed by defendants Sumitomo Corporation of America, Sumitomo Corporation, Sumitomo Futures Corporation, Global Minerals and Metals Corporation, David Campbell, Credit Lyonnais Rouse, J.P. Morgan & Co., Incorporated, and Morgan Guaranty Trust Company of New York are GRANTED on all of plaintiff's federal and state claims; and the motion to dismiss filed by defendants J.P. Morgan & Co., Incorporated and Morgan Guaranty Trust Company of New York is DENIED as moot. The clerk of court is directed to enter judgment for all defendants in cases 99-C-0801-C and 00-C-0528-C and close these cases.